Robert I. Bodian (RB-2627)
Dominic J. Picca (DP-2376)
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
666 Third Avenue, 25th Floor
New York, New York 10017
(212) 935-3000

*Attorneys for Respondent*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
CHARLOTTE GARDNER and DANIELLE B.        :
GARDNER, as Co-Executors, and as Trustees of :   **AFFIDAVIT OF**
the Article SIXTH Trust Created by the Last  :   **PETER WEISMAN**
Will and Testament of JOSEPH H. GARDNER,  :   **IN SUPPORT OF THE MOTION**
                                         :   **TO CANCEL LIS PENDENS**
                        Petitioners,     :
                                         :
        – against –                      :
                                         :
PETER WEISMAN,                           :
                                         :
                        Respondent.      :
-------------------------------------------------------------- x

STATE OF SOUTH CAROLINA    )
                           ): ss.
COUNTY OF SPARTENBURG      )

PETER WEISMAN, being duly sworn, deposes and says:

1. I am a resident of Spartanburg, South Carolina and am the Respondent in this matter. I am the co-General Partner of various real estate limited partnerships in which Joseph H. Gardner ("Joe") and I each were general partners. The control of these partnerships is at issue in this case.

2. I make this affidavit in support of my application to vacate a lis pendens that Petioners placed on 152-160 West 16th Street (the "Property") without notice to me.

1

4140546v.2

Petitioners, by placing the lis pendens on the Property, essentially have enjoined the sale of the Property. Thus, Petitioners have obtained for themselves through self-help the same relief that this Court denied when it vacated the TROs originally obtained by Petitioners.

**Background**

3. Joe and I were in business together for nearly 38 years, buying, developing and selling real property until Joe's death on March 1, 2006. During that time we were loyal and successful business partners, operating by agreement without rancor or litigation of any kind. Beginning in 1968, we assembled a highly profitable portfolio of real estate properties located throughout New York City. Those properties were acquired, managed and sold through various limited partnerships, in which Joe and I were each co-General Partners.

4. Each of the Partnerships is structured in substantially the same way. Specifically, each has two co-General Partners and a small number of limited partners (although the limited partners have no input into the operations of the partnerships). Each Partnership agreement places control of the Partnerships' operations squarely with the General Partners, including (the stated primary Partnership functions): buying and ultimately selling the Partnerships' New York properties.

**The May 29 Agreement**

5. Joe died on March 1, 2006. Pursuant to Joe's will, a trust was established (the "Trust"). Joe's daughter, Danielle Gardner ("Danielle"), is a co-Trustee of the Trust. Among other things, the Trust inherited Joe's interest in each of the real estate Partnerships listed above.

4140546v.2

6. After Joe's death, Danielle was concerned that the Partnerships would dissolve by their terms in 90 days, resulting in the sale of the Partnerships' properties. Danielle made clear that she did not want the properties sold in a "fire sale." As such, Danielle and the Gardner family wanted the Trust to succeed Joe as General Partner of each of the Partnerships. To effect the Gardner family's wishes, I entered into (i) formal consents (drafted by Danielle's counsel), which substituted the Trust as a General Partner of the Partnerships, and (ii) entered into an agreement, dated May 29, 2006 (the "May 29 Agreement"). (A true and accurate copy of the May 29 Agreement is annexed hereto as Ex. A).

7. The May 29 Agreement set forth the rights and obligations of the Partnerships' co-General Partners, including the right of each General Partner to individually market and sell the Partnerships' respective properties.

8. Specifically, the May 29 Agreement expressly confirms "appointment of the Trust as [Joe's] successor General Partner and allows either General Partner to market and sell any of the enumerated properties." To that end, the May 29 Agreement expressly states:

> MODIFIED RIGHT OF FIRST REFUSAL: At any time after 30 days after the date hereof, either GP in each of the entities (the "offering party") will have the right to market and sell (subject to the following right of first refusal) any of the 5 properties owned by the respective entities for sale (including, without limitation, to a condominium converter). Each property would be offered as a whole. Partial interests could not be offered. Upon receipt of a bona fide, third-party written offer to purchase a property that the offering party is prepared to accept, the written offer and all pertinent details would be presented to the other GP. That other GP would then have 20 days to either agree to the sale to the third-party (in which event the property would be sold in accordance with the terms of the offer), or to purchase the offering party's interest and all related or affiliated limited partnership interests of

3

the offering party (collectively, the "selling parties") at a price that is equivalent to the amount the selling parties would have received had the property been sold to the third party upon the terms of the offer.

9. As set forth above, the May 29 Agreement gives Danielle the right to purchase my partnership interest and the partnership interest of affiliated limited partners (as opposed to purchasing the actual Partnership property) in the event she exercises her Right of First Refusal.

10. As evidenced by the May 29 Agreement, I obtained the unanimous vote of the General Partners -- Danielle's vote specifically - - to unilaterally market and sell the properties owned by the each of the relevant Partnerships. In sum, the May 29 Agreement comported with the previously established rights and responsibilities of the Partnerships' General Partners to manage, operate and ultimately dispose of the Partnerships' properties in the regular course of business, at market price.

**To Prevent My Sale of the Properties, Danielle Sued and Commenced Arbitrations Against Me Personally**

11. In July 2006, after Danielle got what she wanted under the May 29 Agreement, Danielle brought a series of law suits in New York Surrogate's Court to enjoin me from selling (among other properties) those owned by 160 Associates.

12. In July 2006, Danielle also commenced three arbitrations against me personally, including one in connection with 160 Associates, before the American Arbitration Association. 160 Associates is not named as a party in that arbitration.

13. During the course of that arbitration, Danielle amended her Statement of Claim twice. In her original Statement of Claim, Danielle alleged that I breached the Partnership agreement by operating and managing the Partnership without involving her as co-Managing Partner, and, for those same reasons, she alleged that I breached

4

fiduciary duties to her personally. In her Second Amended Statement of Claim, Danielle realleged that I breached the Partnership agreement and my fiduciary duties to her personally. The Second Amended Statement of Claim also alleges that I breached the May 29 Agreement by failing to recognize her right of first refusal to purchase my personal partnership interest in 160 Associates.

14.     On or about July 28, 2006, Danielle obtained a restraining order, preventing me from marketing and selling any of the Partnership properties, including those owned by 160 Associates. My counsel removed the case to this court on August 7, 2006.

15.     This court dissolved the restraining orders. (A copy of the Court's Order is annexed hereto as Ex. B.) Accordingly, I was able to and did begin marketing for sale the 160 Associates properties.

**Lis Pendens Against The Properties Owned by 160 Associates**

16.     On March 26, 2007, Danielle filed a lis pendens on the property owned by 160 Associates. (A true and accurate copy of the Judgment Docket and Lien search showing the Lis Pendens is annexed hereto as Ex. C)

17.     As demonstrated on the Lis Pendens, Danielle relied on the lawsuit now pending in this Court to file the Lis Pendens. I never received notice of those Lis Pendens.

**Danielle Has Impeded My Ability to Sell The Property**

18.     The Lis Pendens has impeded my ability to sell the Property. For instance, prior to being aware of the Lis Pendens, I was in intensive discussions with a buyer to purchase the property owned by 160 Associates. However, when the

4140546v.2

prospective buyer performed a title search, it learned of the Lis Pendens and became leery about getting into a potential action with Danielle over title to that property.

19. Thereafter, I was able to find a buyer, Benjamin Shaoul, at a price of $43,500,000. Danielle since has claimed to exercise her right of first refusal, but as explained in the affidavit of my real estate counsel, Mark Lebow, Danielle has refused to abide by the express terms of the May 29 Agreement. In fact, Danielle is doing nothing more than frustrating a sale, and the lis pendens, without any court process or approval from the arbitrators, is simply part of that tactic to frustrate a sale to anyone other than her, on her terms.

_____
PETER WEISMAN

Sworn before me this
27th day of February, 2008

_____
Notary Public

MY COMMISSION EXPIRES MARCH 16, 2010

4140546v.2

**EXHIBIT A**

Realty-Skyline Research, LLC - 175 Remsen Street, Brooklyn, NY 11201 - 718-306-1100

## Judgment Docket & Lien Information - Control Number - 002249192 - 01

### Lis Pendens Index

**Docketing Data**

| | | | |
|---|---|---|---|
| Docketing Date | 03/26/2007 | | |
| Docketing Time | 12:28 | | |
| Effective Date | 03/26/2007 | | |
| Effective Time | 12:28 | | |
| Clerk / Seq # | BCAUSER 080 | | |

**Source Document**

| | |
|---|---|
| Type | LP - LIS PENDENS |
| County | 31 - NEW YORK |
| Court | S - SUPREME COURT |
| Total Blocks & Lots | 01 |
| Index # | 06CV5998 |
| Doc # | 0098 |

**Premises**

| | | | |
|---|---|---|---|
| Block | 00791 | Lot | 00078 |
| Address | 152 - 160 WEST 16TH STREET | | |
| City | NEW YORK NY | Zip Code | 00000 |

**1st Named Defendant / Corporation**
Name   WEISMAN, PETER   Type   I

**1st Named Plaintiff / Corporation**
Name   GARDNER, CHARLOTTE
Address
City            Type   I
                Zip Code   00000

**Disposition Data**
Disposition
Date            Operator ID

Download Date: 03/26/2007

### Remarks

| Date | Remarks |
|---|---|
| 03/26/2007 | OTHER NAMED PLAINTIFFS SEE LIS PENDENCY |
| 03/26/2007 | NATURE OF ACTION: BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY |
| 03/26/2007 | AND A DECLARATORY JUDGMENT WILL AFFECT THE TITLE, OR THE POSSESSION |
| 03/26/2007 | USE OR ENJOYMENT OF THE PROPERTIES |



**EXHIBIT B**

**ROSE & KISSIN** LLP

717 THIRD AVENUE
19TH FLOOR
NEW YORK, NY 10017
TEL: (212) 973-9100
FAX: (212) 973-9101

Lawrence G. Rose
(212) 973-9150
rose@rosekissin.com

May 29, 2006

Mark D. LeBow, Esq.
Sokolow Carreras LLP
770 Lexington Avenue
New York, NY 10021

Steven Simkin, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

*Estate of Joseph H. Gardner & Related Entities*

Dear Mark and Steve:

Further to our conversation, to try to resolve the issues of continuing the 5 entities (West 56th Street Associates L.P, 14-15 St. Associates L.P., 160 Associates L.P., East 22nd Street Associates L.P. and West 15th Street Associates L.P.) and confirming the Trust as Joe's successor General Partner in those entities, Peter Weisman, on behalf of the Weisman family interests in those entities, and Danielle Gardner, on behalf of the Gardner family interests in those entities, has agreed as follows:

MODIFIED RIGHT OF FIRST REFUSAL: At any time after 30 days after the date hereof, either GP in each of the entities (the "offering party") will have the right to market and sell (subject to the following right of first refusal) any of the 5 properties owned by the respective entities for sale (including, without limitation, to a condominium converter). Each property would be offered as a whole. Partial interests could not be offered. Upon receipt of a bona fide, third-party written offer to purchase a property that the offering party is prepared to accept, the written offer and all pertinent details would be presented to the other GP. That other GP would then have 20 days to either agree to the sale to the third-party (in which event the property would be sold in accordance with the terms of the offer), or to purchase the offering party's interest and all related or affiliated limited partnership interests of the offering party (collectively, the "selling parties") at a price that is equivalent to the amount the selling parties would have received had the property been sold to the third party upon the terms of the offer.

{00015411}

2

Please discuss the foregoing with your respective clients, and, if each agrees with the foregoing, please acknowledge and consent by signing below, and return signed copies to me by facsimile, whereupon I will circulate fully executed counterparts to each of you.

By executing this letter, each of you represent that you are authorized to execute this letter on behalf of your respective clients. Furthermore, Mark, by executing this letter, you represent that Peter has signed the General Partner Consents that were forwarded to him last week, continuing the five entities listed above and confirming the appointment of the Trust as Joe's successor General Partner, and that he deems them to be binding and effective.

Promptly after execution and delivery of this letter, the parties shall enter into formal agreements confirming the foregoing agreements, but this letter shall be considered binding upon all of the interested parties in accordance with its terms.

This letter may be executed in counterparts, each of which, when taken together shall constitute but one instrument. Facsimile and/or e-mail signatures shall be considered binding upon the parties so signing.

Sincerely yours,

Lawrence Rose

AGREED

Mark LeBow, on behalf of Peter Weisman and the Weisman Family Group

AGREED

Steven Simkin, on behalf of Danielle Gardner and on behalf of the Gardner Family Group, the Estate and the Trust

{00035411}

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

CHARLOTTE GARDNER, et al., : 06 Civ. 5998 (WHP)
                                                                    06 Civ. 5999 (WHP)
                Petitioners, : 06 Civ. 6001 (WHP)
                                                                   06 Civ. 6002 (WHP)
            -against- : 06 Civ. 6003 (WHP)

PETER WEISMAN, :

                Respondent. :

----------------------------------------X

PETER WEISMAN, :

                Plaintiff, : 06 Civ. 6012 (WHP)

            -against- :

DANIELLE B. GARDNER, :

                Defendant. :

----------------------------------------X

ORDER

WILLIAM H. PAULEY III, District Judge:

        On August 18, 2006, this Court conducted a hearing on the following applications of Respondent-Plaintiff Peter Weisman ("Weisman" or "Respondent"): (1) a motion for a temporary restraining order pursuant to Fed. R. Civ. P. 65 prohibiting Petitioner-Defendant Danielle Gardner ("Danielle Gardner" or "Petitioner") from making unilateral decisions regarding the business operations of P&J Realty Management, LLC ("P&J"); and (2) a motion to dissolve the ex parte temporary restraining orders entered by the New York Surrogate's Court on July 28, 2006 (the "Surrogate's TROs") prohibiting Weisman from "marketing, transferring, selling, leasing, offering for sale, offering for condominium conversion, or otherwise disposing

of" the P&J properties located at the following addresses: 14-15th Street, West 56th Street, 160th Street, East 22nd Street and 100 Fifth Avenue (collectively, the "Properties"). For the reasons stated on the record during the August 18 hearing, Weisman's motion for a temporary restraining order is denied. For the reasons set forth below, Weisman's motion to dissolve the Surrogate's TROs is granted.

"On this motion to dissolve a temporary restraining order, [Petitioner], the party that obtained the order, bears the burden of justifying continued injunctive relief." SG Cowen Sec. Corp. v. Messih, No. 00 Civ. 3228 (HB), 2000 WL 663434, at *1 (S.D.N.Y. May 17, 2000). To secure a temporary restraining order, a party must demonstrate (1) that irreparable harm is likely absent an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation plus a balance of hardships tipping decidedly in Plaintiff's favor. See Mony Group, Inc. v. Highfields Capital Management, L.P., 368 F.3d 138, 143 (2d Cir. 2004); Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd., 339 F.3d 101, 108 (2d Cir. 2003).

Petitioners have failed to identify the irreparable harm arising from Weisman's marketing and selling of the Properties. Although sale of a property would dissolve the corresponding partnership, Petitioner has not shown why money damages would be insufficient to compensate her for the alleged harm. Rodriguez v. DeBuono, 162 F.3d 56, 61 (2d Cir. 1998) (Irreparable harm is an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.") Moreover, the Agreement between Weisman and Petitioner dated May 29, 2006 (the "May 29 Agreement") grants Petitioners the right of first refusal for all of the Properties except 100 Fifth Avenue. Weisman cannot prevent Petitioners from maintaining their ownership interests in these properties.

2

Nor have Petitioners established a likelihood of success on the merits. With regard to 100 Fifth Avenue, Weisman contends that Joseph Gardner failed to designate a successor General Partner of the 100 Fifth Avenue Company L.P. and, therefore, Petitioner has no right to object to the disposal of the property. Section 9.2 of the 100 Fifth Avenue Partnership Agreement provides:

> Upon the happening of a disabling even with respect to a General Partner, the successor General Partner to such disabled General Partner shall be the person designated by such disabled General Partner in a written instrument theretofore executed by such disabled General Partner in recordable form, or in such disabled Partner's Last Will and Testament . . .

(Affidavit of Peter Weisman, dated Aug. 7, 2006 ("Weisman Aff.") Ex. H.) The Trust obtained Joseph Gardner's economic interest in 100 Fifth Avenue only through the "rest, residue and remainder" clause of his will. According to Weisman, because Joseph Gardner failed to "designate" the Trust or Danielle Gardner by name as successor to the General Partnership, Weisman is now the sole General Partner of 100 Fifth Avenue by operation of Section 9.2. Petitioner responds with a broader interpretation of Section 9.2's designation requirement. According to Petitioner, that Section does not explicitly require that Joseph Gardner's successor be designated by name. The designation may purportedly occur through any type of bequest, regardless of its specificity.

A contract is ambiguous "where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and . . . is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005) (internal quotation omitted). The text of Section 9.2 has more than one reasonable interpretation, and therefore is ambiguous. Because

3

the parties have yet to submit extrinsic evidence on this issue, Petitioner has failed to meet her burden of showing that the more expansive interpretation of Section 9.2 is correct. SG Cowen Sec. Corp., 2000 WL 663434, at *1.

Next, Weisman contends that the May 29 Agreement allows "either General Partner," i.e., either Weisman or the Trust, to "market and sell" the properties located at 14-15th Street, West 56th Street, 160th Street, and East 22nd Street. Previously, all decisions required the unanimous approval of the General Partners. Weisman asserts that the May 29 Agreement supersedes this unanimity requirement by permitting a unilateral sale of the properties. Petitioner responds that the May 29 Agreement is void. Absent the Agreement, however, the partnerships would have dissolved on May 30, 2006. (Weisman Aff. ¶¶ 20, 23.) At the August 18 hearing, Petitioner's counsel conceded that the May 29 Agreement was necessary to avoid dissolution of the partnerships. Counsel nevertheless contends that the validity of the May 29 Agreement is a question for the Surrogate's Court, and encourages this Court to abstain pursuant to Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976).

Petitioner's argument is unavailing. There is no motion before this Court to remand the actions involving the Surrogate's TROs to the Surrogate Court. Even if such a motion were filed, it would be unlikely to succeed. Abstention is appropriate in the following circumstances: (1) to avoid decision of a federal constitutional question arising in a case which may be disposed of on questions of state law; (2) to leave resolution of unsettled questions of state law bearing on important policy problems to the state courts; (3) to avoid interference with a pending state criminal proceeding; and (4) to avoid duplicative litigation based on considerations of wise judicial conservation. Abercrombie v. Andrew College, No. 04 Civ. 7717 (KMK), 2006 WL 1716857, at *10 (S.D.N.Y. June 15, 2006). Only the last item is conceivably

4

applicable here, as the Surrogate's Court is tasked with the probate of Joseph Gardner's will. However, litigations are considered duplicative for the purposes of <u>Colorado River</u> abstention only "when the two proceedings are essentially the same; that is, there is an identity of parties, and the issues and relief sought are the same." <u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Karp</u>, 108 F.3d 17, 22 (2d Cir. 1997). The gravamen of the claims in this action involve partnership law, which is not "essentially the same" as the testamentary issues that predominate in the Surrogate's Court proceedings; the disputed issues in this action require neither the interpretation nor the execution of the will.[1] Nor are the parties before the Surrogate's Court identical to the parties before this Court. Indeed, Petitioner cites to no case in which a court has declined jurisdiction pursuant to <u>Colorado River</u> in light of ongoing proceedings before a surrogate's court. Federal courts must heed the "virtually unflagging obligation . . . to exercise the jurisdiction given them," <u>Colorado River</u>, 424 U.S. at 813, and abstention would be inappropriate under the circumstances of this case, <u>cf.</u> <u>Marshall v. Marshall</u>, 126 S. Ct. 1735, 1749 (2006) ("[T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from disposing of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction."); <u>In re Blakeman</u>, 512 F. Supp. 325, 328 (E.D.N.Y. 1981) (declining to apply the probate exception when the "controversy is primarily between two contenders for control of a corporation").

---

[1] In particular, Petitioner contends that the dispute over 100 Fifth Avenue is "inextricably linked with the interpretation of Joseph Gardner's will." (Letter of Y. David Scharf, dated Aug. 15, 2006 ("Scharf Letter") at 9 n.8.) This Court disagrees. Weisman does not contest Petitioner's interpretation of the will. Rather, the dispute before this Court turns on the interpretation of the 100 Fifth Avenue Partnership Agreement. Contrary to Petitioner's suggestion, the interpretation of a partnership agreement does not "fall within the peculiar expertise of the Surrogate's Court. (Scharf Letter at 9 n.8.)

5

Nor do the equities balance in favor of Petitioner. Danielle Gardner entered into the May 29 Agreement to avoid dissolution of the partnerships. Although she understood at the time that the Trust had yet to be certified by the Surrogate's Court (see Letter of Robert I. Bodian, dated Aug. 18, 2006, Ex. B), she now seeks to exploit the absence of a certification to void the May 29 Agreement (see Memorandum in Opposition to Respondent's Motion to Vacate Temporary Restraining Orders, dated Aug. 18, 2006, at 11-12). Equity does not permit Petitioner to reap the benefits of the May 29 Agreement while, at the same time, repudiating those terms of the Agreement that she now disfavors. Further, on June 1, 2006, Petitioner described the offer to buy the West 56th Street property for $2.85 million as "a good deal." (Letter of Robert I. Bodian, dated Aug. 16, 2006, Ex. B.) Less than two months later, Petitioner sought to forestall the same $2.85 million deal by petitioning for the Surrogate's TROs. Therefore, equity strongly favors Weisman in this action.

For the foregoing reasons, this Court hereby dissolves the temporary restraining orders entered by the Surrogate's Court on July 28, 2006 in the following removed actions: Nos. 06 Civ. 5998, 06 Civ. 5999, 06 Civ. 6001, 06 Civ. 6002 and 06 Civ. 6003.

Dated: August 21, 2006
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record*

Y. David Scharf, Esq.
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022
*Counsel for Petitioners-Defendant*

Robert I. Bodian, Esq.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, NY 10017
*Counsel for Respondent-Plaintiff*